UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SENSOR SYSTEMS, LLC, ET AL.

      Plaintiffs,

                                  Case No. 8:19-CV-02581-SCB-AAS

v.

BLUE BARN HOLDINGS, INC., ET AL.

      Defendants.

_____/

**DEFENDANT BLUE BARN HOLDINGS, INC.'s MOTION TO EXCLUDE THE OPINIONS
AND TESTIMONY OF PLAINTIFFS' EXPERT DR. HENRY FISHKIND**

      Defendant/Counterclaimant, Blue Barn Holdings, Inc. ("Blue Barn") respectfully moves on the following grounds for an order excluding the opinions and testimony offered by Dr. Henry Fishkind, the retained expert of Plaintiffs Sensor Systems, LLC, Motor Magnetics, Inc. and Fisher Electric Technology, Inc. (collectively, "Plaintiffs"):

      1.      Dr. Fishkind's proffered methodologies are premised on improper assumptions of fact wholly inapposite to this case;

      2.      Dr. Fishkind's opinions and testimony fail to assist the trier of fact in resolving factual disputes in the case;

      3.      Dr. Fishkind's termination fee approach detrimentally relies on irrelevant facts which fundamentally alter the Parties' transaction;

      4.      Dr. Fishkind's compensation approach fails to address a single issue raised by the Parties' transaction.

**INTRODUCTION AND STATEMENT OF RELEVANT FACTS**

      Plaintiffs filed the above-captioned matter on October 19, 2019, seeking a judicial declaration that their agreement to sell their assets to Blue Barn and Datex Instruments, Inc. ("Datex," collectively the "Buyers") terminated by its own terms. Specifically, Plaintiffs assert that the agreement expired on May 31, 2018, the date contemplated for the closing of the

transaction.[1]  However, Plaintiffs conveniently ignore the reason the transaction did not close was because they, themselves, were unable to tender free and clear title to their assets, as required under the Parties' agreement. Plaintiffs also conveniently ignore that rather than claiming a breach, all Parties elected to proceed with the transaction on the basis that once title to the assets was cleared, the transaction would formally close. And, in the meantime, the Buyers would operate Plaintiffs' companies, as they had been doing in accordance with the Parties' agreement since its execution in December 2017.

The assumption of management before the conclusion of the transaction was highly unusual. Ex. A (Fishkind Deposition), 66:17-20. But the reasons for doing so, in this case, are abundantly clear. As of that time, Plaintiffs had operated at a loss for over five (5) years, had accrued significant debt (some personally guaranteed), and were embroiled in litigation for allegedly illegal employment practices and breach(es) of contract. *See e.g.,* ECF 19, at ¶¶ 13, 20-21, 27, 30-31. Plaintiffs' principal, Richard Horbal, had invested almost $10 million into the Plaintiffs' companies without ever having received any return on investment, had personally guaranteed approximately $4.5 million dollars of company debt, and Plaintiffs did not have the funds necessary to make payroll or pay their debts on an ongoing basis without a further capital infusion from him. Ex. B (Dr. Horbal Deposition), 52:19-53:21; 145:5-8.

The Buyers fulfilled their end of the deal. In addition to curing Plaintiffs' operational problems, Blue Barn, among other things: (1) guided Counter-Defendants through various lawsuits with third parties, including former partners, management employees, and others; (2) worked with the National Labor Relations Board to resolve issues concerning a defaulted Collective Bargaining Agreement; (3) implemented policies to cure Plaintiffs' failure to comply with applicable regulatory standards; and, (4) negotiated new insurance policies to alleviate various shortfalls in coverage. ECF 19, ¶ 27. In short, all the things that Buyers were going to do

---

[1] Originally the date set for closing was March 31, 2018.  However, Plaintiffs had not been able to clear title as of that date and the parties amended their agreement to, inter alia, 1) make it binding upon the parties and 2) changing the proposed closing date to May 31, 2018.

once they acquired Plaintiffs' assets had been done and the benefits of those efforts were now obvious to all Parties. Ex. A, 31: 20-25. Nevertheless, Plaintiffs were under the obligation to sell those assets at the price set in 2017. ECF 1-2, generally,1-3, p.1. Plaintiffs, however, ceased to communicate with Mr. Barkai-Barnik and initiated the instant lawsuit. *See* ECF 1 (Complaint).

In response to the Complaint, Blue Barn filed its Counter-Claim against Plaintiffs alleging causes of actions for, countervailing Declaratory Relief, Breach of Contract/Specific Performance, and Promissory Estoppel. ECF 19 (Blue Barn's Counter-Claim), generally. Alternatively, Blue Barn alleged causes of action based upon the theories of Unjust Enrichment and Quantum Meruit. *Ibid.* Similarly, Datex Instruments, Inc. ("Datex") filed a counterclaim against Plaintiffs alleging Unjust Enrichment. ECF 17 (Datex's Counter-Claim), generally. Blue Barn and Datex (collectively, the "Buyers") seek the reasonable value of their services for their efforts invested in turning Plaintiffs' failing businesses around. Ex. A, 31:20-25.

To counter the Buyers' counterclaims, Plaintiffs retained Dr. Henry Fishkind ("Dr. Fishkind") and C. Donald Wiggins ("Mr. Wiggins") as experts on compensation and valuation. Dr. Fishkind subsequently provided a report which concludes that the reasonable value of *Blue Barn's* services should be based upon one of two alternate approaches.

Dr. Fishkind has opined that the first approach, a "termination fee" analysis, is a suitable measure of the value of *Blue Barn's* services. A termination fee, however, is a contractual provision negotiated by parties to protect against the costs associated with pursuing an investment, usually in non-breach situations. As Datex is also a part of the Buyer, Dr. Fishkind's failure to apply this approach in his analysis of the reasonable value of Datex's contribution to the Plaintiffs' companies in of itself renders his opinion unreliable. *See* Ex. C (Fishkind Report), generally. Further, and importantly, the Parties *never negotiated or incorporated a termination fee provision into their transaction*.

Dr. Fishkind's second approach consists of a "compensation" analysis as it pertains to *Blue Barn*, which establishes a baseline compensation typical for *private equity professionals*. This second approach, however, is just as unreliable and irrelevant as the first because the

standard, in this case, is the reasonable value of the *Buyers' efforts*, not the compensation rates for private equity firm employees. Further, in reaching his conclusion on the "compensation" approach, Dr. Fishkind relies on data which is inapposite to the Parties, their transaction, and the facts of this case. His opinion must therefore be excluded.

## SUMMARY OF ARGUMENT

The assignment given to Dr. Fishkind was to address two issues related to Blue Barn.

> "1.1 Did Blue Barn Suffer any economic damage related to the compensation and expenses?
>
> 1.2. If so, how much damage did Blue Barn incur."

Ex. C, ¶¶ 1.1, 1.2.

In responding to these questions, Dr. Fishkind offers opinions on numerous aspects of the Parties' transaction that are not the subject of his expertise, that are unsupported by law or fact, and which transgress into the province of the trier of fact. These improper opinions, as set forth in his report, as well as the reasons why they are unreliable, speculative, and subject to exclusion, are as follows:

A.    That Stephen Kirkland's opinion[2] is flawed because it is predicated on assumptions inconsistent with the Parties' Letter of Intent ("LOI") and the LOI's Amendment ("Amendment"). *Id.*, at ¶ 24.0. The entirety of Dr. Fishkind's opinion is based upon his, subjective, assessment of the terms of the Parties' agreement and his interpretation of the legal effects of events that transpired. *Id.*, at ¶¶ 14.0, 24.0, 25.0, 26.0, 33.0, 36.0; *see also In re Lyondell Chem. Co.,* 558 B.R. 661, 668–69 (Bankr. S.D.N.Y. 2016) (excluding expert testimony where factual "cherry-picking" and "editorializing" resulted in a "factual narrative" invaded the

---

[2] Dr. Fishkind's opinion addresses Blue Barn's claim for quantum meruit. This cause of action, as indicated above, is an alternative to Blue Barn's claims for breach of contract, specific performance and unjust enrichment. The damages suffered by Blue Barn relative to those causes of action are the subject of the expert report prepared by Peter Gampel. Dr. Fishkind does not offer any opinion with regard to the subject matter of Dr. Gampel's report or any other of Blue Barn's claim, other than quantum meruit.

province of the fact finder). Dr. Fishkind fails to support his opinion that, as a result of its experience, Blue Barn assumed the risk that it would not be compensated for its efforts in operating and managing the Plaintiffs. *Id.*, at ¶ 25.0.

**B.**     That Blue Barn's compensation, if any, should be based upon a "termination fee approach."  *Id.*, at ¶ 26.0. First, compensation is not the required standard. The applicable standard is the reasonable value of Blue Barn's efforts based on numerous factors *never discussed in Dr. Fishkind's report*.  As detailed below, a termination fee is a contractual term negotiated by parties to address various contingencies that may preclude them from closing their transaction. It is not intended as a vehicle to address breaches of contract, after there is a breach. In fact, if such a provision would have been included and if the terms had been applicable, there would be no breach in the first instance.

Furthermore, the data utilized by Dr. Fishkind refers to what parties to particular types of transactions historically agreed upon. *Id.*, at ¶¶ 51.0-52.0; Ex. D (Houlihan Lokey, 2017 Transaction Termination Fee Study ("2017 Study"), generally. The data may give guidance to parties contemplating transactions, but it has nothing to do with involutory occurrences such as a failure and/or refusal to perform. Ex. D, generally.  Confirming the inapplicability of the Houlihan Lokey study are the stated criteria therein, which reflect the study pertains to transactions involving, inter alia, publicly traded companies with a transaction value in excess of $50,000.000. *Id*. The instant transaction does not fall anywhere close to, let alone within, the scope of the data of the study. Further, the transaction fee study does not address the unique situation presented here, when the buyer actually takes over control and management of the subject of the transaction, culminating in its salvation from certain financial collapse.

**C.**     That Mr. Kirkland's use of the "independent investor approach" is not applicable in this case. *Id.*, at ¶ 43.0. Not only does Dr. Fishkind fail to provide any basis to support this conclusion, but he also fails to perform any form of differential analysis to determine his own valuation under that approach.  Instead, he acknowledges that the "independent investor approach" is appropriate to "determine the reasonable compensation paid by closely held

companies to their owner-employees." *Id.*, at ¶ 42.0. *This is precisely the issue presented in this case*: the proper compensation for one who successfully operates an entity for the sole purpose of receiving all profits from its operations or sale.

In arguing against the independent investor approach, Dr. Fishkind suggests that a better method would be the "Build-Up" method. *Id.*, at ¶ 44.0. This method establishes the value of a discount rate to a stream of future cash flow to estimate the equity rate of return. *Id*. Dr. Fishkind, however, fails to engage in any explanation or analysis as to why it is the "more appropriate approach." *Id*. In short, Dr. Fishkind dismisses one approach for another, without any substantiation.  Consistent with this total lack of thoughtful analysis, Dr. Fishkind provides conclusory statements that the independent investor approach is inappropriate because Blue Barn should have known the transaction might not close and therefore assumed that risk. *Id.*, at ¶ 45.0.

**D.**     Dr. Fishkind's second opinion supposes Blue Barn's compensation should be based upon the reasonable value of compensation paid to *private equity professionals*. Ex. C, ¶ 54.0. As indicated above, compensation is not the issue in this case – the reasonable value of Blue Barn's efforts expended on turning Plaintiffs' businesses around – is. What companies pay their employees is irrelevant to that question, especially when the companies in the study relied upon by Dr. Fishkind have no relevance to Blue Barn. Blue Barn's investment was for its own account. And the Buyers operated Plaintiffs for the purpose of deriving 100% of the available income for the Buyers and to receive 100% of the value of Plaintiffs upon their sale.  Dr. Fishkind's reliance on the private equity managers identified in the study ignores the fact that the managers surveyed were essentially *employees of companies* that managed investments for their investors. Ex. E, (Heidrick & Struggles "2016 North American Private Equity Investment: Investment Professional Compensation Survey ("2016 Survey"), generally. They did not operate companies for their own account, as Blue Barn did.

In this case, Dr. Fishkind takes average private equity employees' salary and divides it to get an hourly rate. Ex. C, ¶ 56.0. And adding insult to injury, Dr. Fishkind then discounts Blue Barn's estimate of time expended on Plaintiffs to 373 because he did not receive time records for

more than that number. *Id.*, at ¶ 54.0. Dr. Fishkind conveniently ignores that no time records are kept by Blue Barn. ECF 87-1.

Thus, for the forgoing reasons, and those discussed in detail below, Dr. Fishkind's implementation of unreliable methodology, which incorporates invalid assumptions based on irrelevant facts, renders his testimony completely unable to assist the trier of fact.

## LEGAL DISCUSSION

### A. Standard For Admission of Expert Evidence

In *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993), the Supreme Court established a critical "gatekeeping" role for the trial court to determine that all expert testimony is both reliable and relevant before being admitted into evidence. *See Daubert*, 509 U.S. at 597. In order to implement this role, the court must ensure that the expert's testimony constitutes "good science" and that findings are sufficiently "derived by the scientific method" or otherwise "supported by appropriate validation." *Id.* at 590, 593. Based upon Fed.R.Evid. 702, the *Daubert* Court adopted a two-pronged standard governing the admission of scientific expert testimony. *See id.* at 595. In determining the admissibility of expert testimony, courts must decide: (1) whether the "reasoning or methodology underlying the testimony is scientifically valid"; and (2) whether the "reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-94. Six years later in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999), the Supreme Court reiterated the significance of the "gatekeeping" function noting that it was important in ensuring the "relevancy of expert testimony." *See Kumho Tire Co.*, 526 U.S. at 152. The court went on to say that "whether basing testimony upon professional studies or personal experience" there must be assurances that the expert employs the "same level of intellectual rigor" in the courtroom as they would in the field. *See id.*

Similarly, the Eleventh Circuit has explained that expert testimony is admissible if: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through

the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. [citations omitted]." *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). Further the Eleventh Circuit has noted assistance to the trier of fact is "key", assuming the fact on which the expert offers testimony on is relevant. *See United States v. Roark*, 753 F.2d 991, 994 (11th Cir. 1985).

The burden of establishing these prerequisites lies with the proponent of the evidence. *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). The proponent of the expert testimony has failed to meet their burden where an expert's testimony consists of "conclusory statements devoid of factual or analytical support." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1113 (11th Cir. 2005). Further, the proponent's burden is not satisfied by where the testimony relies on the expert's unexplained assurances that an opinion rests on accepted principles. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005). An expert's "conclusions [must] be supported by good grounds for every step in the analysis;" this "means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *McClain,* 401 F.3d at 1245.

### 1. Expert Qualifications

An expert must be "qualified as an expert by knowledge, skill, experience, training, or education...." Fed.R.Evid. 702. While the determination of whether or not an expert is qualified is case-specific, the Eleventh Circuit has approved of the exclusion of testimony when it falls outside of the area of the expert's competence. See *City of Tuscaloosa*, 158 F.3d at 565 (statistical expert was prevented from testifying on issues related to legal standards and the existence of a conspiracy).

### 2. Reliability of the Expert's Testimony

If an expert is determined to be qualified by the court, the next inquiry the court must answer is whether or not the testimony in question is reliable. "When evaluating the reliability of scientific expert opinion, the trial judge must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology

properly can be applied to the facts in issue. [citation omitted]. *United States v. Frazier*, 387 F.3d 1244, 1261–62 (11th Cir. 2004). Thus, the reasoning and methodology must not only be sound, but the expert must also be able to establish that it is properly applied to the facts of the case.

More specifically, the reliability prong requires that: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

### 3.  Relevance of the Expert's Testimony

In addition to being reliable, an expert's testimony must assist the trier of fact and in order to provide this valuable assistance the testimony must be relevant.  The Eleventh Circuit has noted assistance to the trier of fact is "key", assuming the fact on which the expert offers testimony on is relevant. *See United States v. Roark*, 753 F.2d 991, 994 (11th Cir. 1985). These aspects of the expert's testimony are intertwined with one another: if the testimony relates to issues not relevant to the case, then it is non-helpful. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1347 (11th Cir. 2003). Further, the testimony must be "sufficiently tied to the facts of the case" such that it will "aid the jury in resolving a factual dispute. *Id.* "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004).

### B.  Dr. Fishkind is Not Qualified to Provide Testimony Because His Experience is Inapplicable to the Parties' Transaction

While Dr. Fishkind may be an expert in some things, he is not an expert in what is rightfully the province of the trier of fact: to determine the ultimate value of the Buyers' successful efforts in turning around Plaintiffs' companies. Dr. Fishkind's experience is insufficient to provide expert testimony as to reasonable value of the Buyers' efforts.  In this case, Dr. Fishkind's assignment was to address the reports of Blue Barn's expert Kirkland and Datex's expert Dinkin. Ex. A, 12:10-14. The Buyers' experts provided reports evaluating the

reasonable value of the Buyers' efforts between the time they took over management of Plaintiffs' companies and the filing of Plaintiffs' complaint (October 19, 2019).

When questioned on his professional experience, Dr. Fishkind testified that he was the founding board member of two public companies "who pursued numerous transactions" *Id.*, at 62: 23-63:6. During his time at the University of Florida, Dr. Fishkind engaged in economic studies which mostly concerned the Florida economy, none of which directly pertain to the issues of the instant case. Ex. C, ¶¶ 7.0, 8.0. Dr. Fishkind further advised that he served on the boards of two public companies, one a home building company and the other a Real Estate Investment Trust (REIT), during which time the companies had "numerous transactions" such that Dr. Fishkind is "familiar with that type of transaction." Ex. A, 112:17-113:3. Dr. Fishkind admitted that none of the transactions related to the two public companies were similar to the transaction at issues or similar in the types of industries implicated in this case. *Id.*, at 113:12-18. Dr. Fishkind likewise admitted that his experience as a board member of ABT family of mutual funds provided no experience which relates to the issues raised in this case. *Id.*, at 115:21-116:2.

Regarding executive compensation, Dr. Fishkind testified that the only direct relation within the scope his work related to professional practice executive compensation and indirectly in calculating the value of services rendered to business entity by their executives. *Id.*, at 116:23-117:3.

Dr. Fishkind bases the entirety of his termination fee approach on his "experience" however, this cannot justify allowing his testimony which could result in the trier of fact to considers the provision incorporated into the Parties transaction. In fact, Dr. Fishkind abandons his own knowledge of termination fees in relying on termination fees negotiated by third parties without any connection to this suit. Ex. D, p. 7. Dr. Fishkind uses this information to improperly apply a termination fee to the Parties' transaction. Despite this, Dr. Fishkind fails to ever apply his termination fee approach to Datex, who like Blue Barn, is a party to the transaction at issue. Other than stating that he is familiar that termination fees are used and should be used, Dr. Fishkind never provides evidence that supports that he has actually calculated one. Nor does Dr.

Fishkind substantiate that he has been asked to interpret them or to apply them in the context of a claim for quantum meruit.  Dr. Fishkind is unable to establish any expertise or experience in applying termination fees where the parties have *not agreed to one*.

Dr. Fishkind is further unqualified to render his opinion related to his "termination fee" approach for determining the reasonable value of Blue Barn's services. Dr. Fishkind admits, the transaction between the Parties is "unique" and "highly unusual." Ex. A, 42:23-43:7; 66:12-25; 88: 19-25. Thus, Dr. Fishkind's expertise, which is inapposite of the Parties or their transaction, and is of no consequence in this case. First, Dr. Fishkind has no experience with the types of industries in which Plaintiffs operate. ECF, ¶¶ 9-11; Ex. A, 113:12-18. Dr. Fishkind's experience predominately relates to real estate transactions, which is wholly inapplicable here. Ex. A, 112:17-113:18. Second, Dr. Fishkind acknowledges that a majority of his work relates to contracts, *not letters of intent*, and of those are letters of intent relate to tax-exempt loan transactions. *Id.*, at 82:5-83:13.

In all instances, Dr. Fishkind's experience pertaining to compensation is either in the context of valuing a professional practice (e.g. doctors or lawyers) or his experience was only peripherally related to compensation of corporate employees. *Id.*, at 116:18-117:3. Dr. Fishkind has no experience to opine as to what reasonable compensation should be. This is also reflected in the fact that the methodology used by Dr. Fishkind is inapplicable to this case. Dr. Fishkind relies on data which pertains to compensation paid to executives in the private equity management business. He has no experience in determining what an independent entrepreneur's (such as Mr. Barkai-Barnik) compensation would be related to their services in turning around failed companies. Further, Dr. Fishkind offers no basis upon which he is an expert in calculating reasonable compensation for private equity management professionals, or how the Buyers' management team even remotely correlates to the salaries of private equity employees.

Dr. Fishkind's candid admission that the underlying transaction was "unique" requires him to explain how he has the qualifications to determine what the damages might be or what is

the best methodology to reach that conclusion. *Id.*, 66:12-20. Other than asserting his opinion that his approaches are correct, he does little to satisfy the court's gatekeeper function.

Dr. Fishkind offers no support for the efficacy of using a compensation rate table in the 2016 Survey. Ex. E, p. 10. Dr. Fishkind sought a survey which he believed would be applicable to this case, and then merely reviewed and selected an average compensation rate set forth in the table. *Id.* The table used only provides a minor portion of data relative to the compensation Dr. Fishkind attempts to apply to the facts of this case, he completely omits discussion of a secondary table with additional data. *Id.*, at p. 16. Dr. Fishkind provides no substantiation that he has interpreted this survey, or that he understands precisely how this information is used.

The lack of expertise has led Dr. Fishkind to submit two inconsistent theories, neither of which is supported by any reasonable or reliable methodology. In addition to Dr. Fishkind's lack of qualifications to render his opinions, his testimony should be excluded because they do not satisfy the *Daubert* test or applicable rules.

**C.** **Dr. Fishkind's Termination Fee Approach is Based Upon Unreliable Methodology And Will Mislead the Trier of Fact**

    **a. Termination Fees**

A termination fee is, in essence, is a contractual provision that is "heavily negotiated" to provide protection to a party's investment, by establishing compensation for expenses a party may incur in proceeding in a transaction. Ex. C, p. 12 n. 10; Ex. D, p. 5; Ex. A, 79:24; 80: 1-7; Ex. F (Wiggins Deposition), 36:14-37:18; *see also* Judd F. Sneirson, Merger Agreements, Termination Fees, and the Contract-Corporate Tension, 2002 Colum. Bus. L. Rev. 573, 578 (2002) ("Sneirson"). The parties' negotiations are based upon the relative bargaining power and the terms are influenced by the time and expense that "each party *anticipates [expending]in pursuing the transaction.*" Ex. A, p. 91:18-21 (emphasis added); *see also* Snierson, at 578 (identifying potential buyer costs resulting from "searching for and identifying an appropriate target company, and the legal, accounting, and financial fees it has accumulated in negotiating and proceeding toward the merger, will all have been for naught"). Thus, in the event a deal does

not close, a terminations fee is designed to protect a party's investment throughout the pendency of the transaction.

Sometimes called a "break-up fee", these provisions in acquisition contracts establish conditions for execution, and thus payment to the non-terminating party, including "the failure of the acquisition to receive the necessary stockholder vote while a competing proposal is outstanding, the termination of the acquiror's interest in the event the target board withdraws its recommendation, and the breach by the target of any representations, warranties, and covenants in the acquisition agreement." § 7:53. Termination fees, Corporate Acquisitions § 7:53 (2020); *see also* Ex. A, 81:10-19; *see also* Ex. F, 36:14-37:18. Further, termination fees are more often utilized in transactions with higher values, due to the greater risk involved to the parties, and less often used in smaller transactions. *See* Ex. A, 75:17-76:1; Ex. F, p. 37:7-18.[3] Based on the forgoing, a termination fee is directed at covering the anticipated costs associated with facilitating the closure of a transaction. Thus, at the core of a termination fee provision is the parties' negotiation, and approval, *prior to it being implemented* and not a reflection of the damages suffered by one party due to the breach of the other.

### i. 2017 Termination Fee Study Relied on by Dr. Fishkind is Inapposite to the Parties and Their Transaction

Dr. Fishkind's report, relies on a 2017 Study which he admits has zero applicability to the facts of this case. Ex. A, 194: 19-25; *see also* Ex. B, ¶ 51.0; Ex. D, p. 4. The 2017 Study establishes the following transactional criteria as a perquisite for inclusion in the study: (1) the target company is a U.S. public company; (2) the transaction was announced between January 1, 2017, and December 31, 2017; (3) the transaction value is greater than $50 million; (4) the transaction type comprises acquisition of full or majority interest, leveraged buys outs, and/or

---

[3] *See* § 16.06 TERMINATION FEES, TKRDF § 16.06, 16-119, n.278, n.298 (citing four studies by (1) Schulte Roth; (2) Weil; (3) Houlihan Lokey, (4) Practical Law, *Deal Protections and Remedies: A Study of Public Merger Agreements in 2016* which exclusively examined termination fees in transactions valued at over $50 million); *see also* Ex. D, generally.

tender offers; (5) deal status is completed, pending, or withdrawn; and (6) target termination fee is disclosed. Ex. D, p. 4. Of the various criteria relied on, *none of them are applicable to the Parties, their transaction, or the facts of this case*. Ex. A, 189: 25-190:17. Essentially, the 2017 Study evaluates "termination fees in public entities[']" "securities type transactions." *Id.*, at 193:4-11. The Parties' transaction neither deals with public entities, nor does it deal with the exchange of securities. The Buyers transacted for 100% *ownership* of Plaintiffs. ECF 19, ¶ 22. Lastly, the final criteria, which utterly demolishes Dr. Fishkind's reliance on the 2017 Study, is inapplicable to the Parties for the simple fact that *there is no termination fee incorporated into the Parties transaction at issue in this case.* Ex. A, 79:4-9.

In this case, Dr. Fishkind's use of a termination fee would not reflect the actual economic value of the Buyers' contributions to Plaintiffs. Further, application of a termination fee at this stage, is completely inapposite to the rationale for using a termination fee: avoiding litigation. If the trier of fact is presented with this testimony, Dr. Fishkind would be able to force down the throat of the Buyers a calculation that they never agreed to. Further, Dr. Fishkind's termination fee approach would bind the Buyers to a provision for which they never receive any consideration.

### b. Application of the Termination Fee to the Parties' Transaction is Based on Improper Assumptions

Dr. Fishkind's reliance on the 2017 Study, and his proffered rationale for it use, establish that his methodology is woefully without analytical support. Dr. Fishkind readily admits that he is unsure as to whether the fourth criteria's reference of a "full or majority interest" relates to a shareholder's interest as opposed to asset ownership. *Id.*, at 192:16-23. Further evidencing Dr. Fishkind's inability to understand this study, Dr. Fishkind fails to account for a section discussing a "finance buyer" defined as a "buyer seeking to profit by making an acquisition but not necessarily expanding its own business operation" (contrasting to a "strategic buyer" seeking vertical or horizontal integration). Ex. D, p. 16. Of the "financial acquisitions" evaluated (those by financial buyers) the median termination fee was 2.6%. *Id.* Arguably, the Buyers could

conceivably fall within this category, yet Dr. Fishkind does not even discuss, let alone analyze, this distinction in determining his termination fee percentage of 3.25%. Ex. C, ¶¶ 52.0-53.0.

Dr. Fishkind, merely takes the average fee of the reported transactions "as the best metric" because he is unable to compare Plaintiffs' industries with those noted in the study. Ex. A, p. 203:14-204:20. However, in Dr. Fishkind's own report (Ex. C, ¶ 67.0) he decried Datex's expert's utilization of the "mean (or average) compensation data for comparable companies…because the Plaintiffs companies were clearly not comparable to the average company..." Ex. C, ¶ 67.0. Dr. Fishkind's report *implements this very same methodology*, and "despite the fact that [he] was informed…of these facts…he proceeded to compare Plaintiffs" with companies who operated within industries which were not "exact matches." Ex. A, 204:1-20; Ex. C, ¶ 70.0; *see also See Lincoln Rock, LLC v. City of Tampa,* 8:15-CV-1374-T-30JSS, 2016 WL 6818959, at *8 (M.D. Fla. Nov. 18, 2016) (excluding Dr. Fishkind's testimony on the basis of unreliable methodology where Dr. Fishkind solely relied on the average of an arbitrarily selected single criterion and provided "no data point, research documents, analysis, fact-finding or investigation to the materials offered to support").

Dr. Fishkind's use of the 2017 Study solely relies on the fact that it provides data related to termination fee percentages. Beyond that, he fails to scrutinize or analyze any other aspects of the transactions reported. Regardless, even if he had, *none of the criteria within the study apply to this case*. Dr. Fishkind simply found a study on termination fees and applied it to this case in order to "contrive[]…[a] particular result." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005). Dr. Fishkind's failure to implement rigorously analysis raises serious questions as to the reliability of his methodology, and therefore the reliability of his testimony to be put forth at trial.

Illuminating the unreliability of Dr. Fishkind's "termination fee" approach is the testimony of Plaintiffs' second expert, Mr. Wiggins. Mr. Wiggins indicated that, under circumstances almost identical to this case, wherein he was tasked to determine the reasonable value of services rendered [i.e., the Buyers in this case], he did so without imposing a

termination fee. Ex. D, 39: 16-25. In fact, Mr. Wiggins indicated that he had *never* used a termination fee to determine reasonable compensation in litigation. *Id.*, at 39: 21-40:2.

Dr. Fishkind fails to substantiate his use, and understanding, of the *only* report he relies upon to bind the Buyers to an invalid measurement of compensation. Yet he would have the trier of fact believe a termination fee must be imposed on the Buyers. Clearly, Dr. Fishkind's conclusion is without any factual basis or support, making his testimony wholly unreliable.

### c. Dr. Fishkind's Termination Fee Approach is Based Upon Irrelevant Assumptions of Fact

Alarmingly, Dr. Fishkind acknowledges that the Parties' transaction "does not qualify for any of the transaction types" noted in the 2017 Study. Ex. A, 194: 19-25. In fact, Dr. Fishkind admits that he is unaware of any data or published study which would support the amount or frequency of a termination fee involved in a case such as this. Ex. A, 76: 10-20. Thus, Dr. Fishkind's application of a termination fee fails to assist, and will in fact mislead and confuse, the trier of fact because it does not relate to relevant facts of this case.

The entirety of the 2017 Study presupposes that the transaction involved *contained a provision for a termination fee*. *Id.*, at 195:16-196:2. Dr. Fishkind readily admits, the Parties' agreements do not incorporate or utilize a termination fee. *Id.*, at 79:4-9. On this basis alone, Dr. Fishkind's testimony must be excluded because its assumption of irrelevant facts will not help the trier of fact determine the reasonable value of the services the Buyers rendered. *See also Bank of Am., N.A. v. Russo,* 611CV734ORL22GJK, 2013 WL 11326726, at *4–5 (M.D. Fla. June 17, 2013), *aff'd sub nom. Bank of Am., NA v. Dello Russo*, 610 Fed. Appx. 848 (11th Cir. 2015) (excluding Dr. Fishkind's testimony because his opinion was irrelevant, in assuming a transaction with a "willing seller…not under any compulsion to sell" when the facts of the case related to a sale "undertaken out of compulsion."). In fact, Dr. Fishkind's testimony will only serve to confuse the trier of fact's valuation, because it would base the Buyers' compensation on a fact which is completely irrelevant to this case.

Application of the termination fee, and the percentage supposed by Dr. Fishkind, is wholly inapposite to the expectations of the Parties. Dr. Fishkind assumes, without basis, that Blue Barn is not entitled to the increased value of Plaintiffs' because the Parties failed to execute another LOI or Amendment. Ex. C, ¶ 25.0. But Dr. Fishkind fails to take into account that the Parties continued to seek closure of the transaction, including the Buyers' expenditure of efforts invested in turning Plaintiffs' failing businesses around. Ex. A, 31: 20-25. Of course, the Buyers took the risk that Plaintiffs' business, as result of their investment would not profitable again, and Dr. Fishkind aptly acknowledge "Blue Barn knew, or should have known, the risks that it was undertaking." Ex. C, ¶ 45.0. Whether or not Blue Barn contemplated whether the transaction would close is not an issue in this litigation.  Neither is it a principle of economics upon which he can opine. Ex. A, 89:10-92:2. The question is whether Blue Barn is entitled legally to damages and what the amount of those damages should be. Dr. Fishkind's use of a purported and unsupported belief into the potential for failure of the deal to justify the use of a termination fee approach must be rejected. Ex. C, ¶ 25.0.

Further, Dr. Fishkind's report claims that termination fees are "commonly used" in "transactions of the type at issue in this case." *Id.*, at ¶ 26.0. Confusingly, Dr. Fishkind acknowledges that he was unable to find data related to the amount and frequency of terminations fees used in transaction like the ["unique"] one at issue. Ex. A, 76:10-20; 88:19. What is more, Plaintiffs second expert discloses the possibility that Dr. Fishkind's assertion in his report is valid. [4] Thus, not only is application of a termination fee not helpful to the trier of fact in determining Blue Barn's compensation, but it is also irrelevant to the Parties and their transaction.

///

---

[4] Mr. Wiggins acknowledged that it would be unusual to have a termination fee in a transaction like the one at issue, as they are more utilized in pure real estate, and larger transactions. Ex. F, 35:14-25; 36:1-37:18. Mr. Wiggins also noted that, in a dispute almost identical to this case, he did not utilize a termination fee to determine the reasonable value of the services rendered because it was not implicated in the fact. *See Id.*, at p. 32:13-24; p. 39: 20-40:8.

Thus, as outlined extensively herein, Dr. Fishkind's failure to provide expert opinion on matters which are *relevant to the facts of this case raise serious concerns that the trier of fact will be misled* to believe that the termination fee approach would be an appropriate.

**D. Dr. Fishkind's Compensation Approach Fails to Consider Facts Critical to the Expectation of the Parties**

Dr. Fishkind's second, and equally unreliable, method he uses to establish Blue Barn's reasonable compensations relies upon irrelevant facts and improper assumptions. Dr. Fishkind's "compensation approach" relies on data from the 2016 Survey. Ex. C, p. 12, fn. 10; Ex. E, generally. As explained below, Dr. Fishkind's approach, and its reliance on the 2016 Survey, are without basis in facts relevant to this case.

**a. Dr. Fishkind's Compensation Approach is Unreliable and Bears on No Facts of This Case**

Blue Barn, as an entity, seeks recovery of its investment in turning Plaintiffs' failing businesses around. Dr. Fishkind's attempts to compensate a single member of Blue Barn, Mr. Barkai-Barnik for the "reasonable value of his services." Even if this was the appropriate method to determine Blue Barn's damages (which it is not) the data on Dr. Fishkind relies upon is without a doubt unreliable as applied to Blue Barn or managing partner Mr. Barkai-Barnik. *See* Ex. B, ¶¶ 54.0-56.0; Ex. E, generally.

Dr. Fishkind's report confuses what a private equity professional does for its employer and the value of an entrepreneur in saving a company from eminent failure. Dr. Fishkind opines that Blue Barn is entitled to compensation based upon the number of hours it expended by one person, Mr. Barkai-Barnik. Ex. C, ¶¶ 54.0-55.0. Rather than determining the inherent value of those services, he chooses instead to calculate an hourly rate for Blue Barn employees based upon what private equity professionals are paid. However, Blue Barn is not in the business of private equity management. It invests its own funds and manages its own portfolio.

Private equity professionals are those persons employed by private equity management firms. They manage the investments of third parties, whether they be in the form of limited

partnerships, investment trusts, large often public corporations and similar investments. Ex. A, 106:12-107:19. Private equity firms have employees that provide oversight of the investments made by the investors of private equity firms. *Ibid*. The firms typically collect a percentage of the value of the asset when sold and the investors receive the vast majority of return on the investment. *Ibid*. Thus, Dr. Fishkind's limited private equity professional compensation methodology cannot reliably, when applied to the facts of this case, provide a basis for determining the reasonable value of the services rendered to Plaintiffs.

Critical to the unreliability of Dr. Fishkind's compensation approach, is the opinion is only derived from self-reported data of two (2) anonymous partner/managing directors of "recent funds" which "raised less than $250 million." Ex. C, ¶ 54.0; Ex. E, p. 10. Solely relying on this data, Dr. Fishkind opines that "partners and managing directors like Mr. Barkai-Barnik" received compensation that ranged from "$325,000-to-$400,000" in 2015. Ex. C, ¶ 54.0. On this basis alone, Dr. Fishkind's compensation approach, as applied to the facts of this case, is completely unreliable. First, Mr. Barkai-Barnik is not a partner/managing director, he is the managing partner and effectively the owner of Blue Barn. *See* ECF 1-2 (Letter of Intent), p. 1 ¶ 3. The survey which Dr. Fishkind relies upon does not even provide data for "managing partners" of "recent fund" firms valued at less than $250 million. Ex. E, p. 10. Dr. Fishkind's report fails to discuss what a "recent fund" means and fails to consider (let alone raise) concerns regarding the sufficiently of the data sets. There is zero information related to compensation of partners/managing directors and managing partners on "AUM" basis for the time period relied upon by Dr. Fishkind. Ex. E, p. 16. Further, Dr. Fishkind never discusses the rationale for reliance on the "recent fund" as opposed to the "AUM" data. *Id.*, at p. 10, 16. Though, the likely reason is that the lack of data in the "AUM" set failed to provide an expeditious rationale, as the "recent fund" set does, for Dr. Fishkind's "compensation approach."

In addition, assuming again that the 2016 Survey were applicable to this case (which it is not), Dr. Fishkind's report does not account for all aspects of data provided in the survey. Dr. Fishkind concludes, without providing analysis, that he did not include calculation of "carry

interest" into his calculation because "it's inapplicable here". Ex. A, 104:2-13. A more likely

explanation for Dr. Fishkind's wanting methodology is that there "wasn't the data to add the

carried interest appropriately." *Id.* Such conclusory results are lacking in the "intellectual rigor"

required by the courts. *See Kumho Tire Co.*, 526 U.S. at 152. Further, Dr. Fishkind's report never

discusses that managing partners (as well as partners/managing directors) in the "West Coast"

earn "significantly more than their counterparts in other regions." Ex. E, p. 29. Blue Barn is

located in San Diego, California and, according to the 2016 Survey, is therefore prone to

receiving a higher compensation rate. ECF 1, ¶ 7. Regardless, of Dr. Fishkind's erroneous

determination that Blue Barn is limited to employee compensation, nowhere in his report is this

variable accounted for. *See* Ex. C, generally.

Thus, even if the 2016 Survey could be applied to evaluate of the compensation for Blue

Barn's investment in Plaintiffs (which it cannot), Dr. Fishkind's invalid assumptions, improper

application of the compensation data, and failure to account for the numerous variables in the

data set render his testimony unreliable.

### b.  <u>Dr. Fishkind's Compensation Approach Provides No Assistance to the Trier of Fact</u>

At the core of Dr. Fishkind's compensation approach is a fatal flaw which fails to account

for a critical aspect of Blue Barn's cause of action against Plaintiffs. *Blue Barn* seeks recoupment

of its investment in Plaintiffs' failing businesses. The amount of compensation Mr. Barkai-

Barnik should receive is irrelevant to the evaluation of Blue Barn's counterclaim. As a result of

this irrelevant assumption of fact, Dr. Fishkind's testimony will be unable to help, and will in

fact mislead and confuse, the trier of fact. Blue Barn successfully invested its efforts into

Plaintiffs, and it is entitled to the reasonable value of those services as alleged in its quantum

meruit cause of action. Dr. Fishkind agrees with this, perhaps without realizing it, as he

concurred that the combined equity between a private equity firm and its investors would result

in would result in "one hundred percent" of the recouped investment. Ex. A, 108:6-16. The facts

of this case are in complete alignment with this position, Mr. Barkai-Barnik, as owner and

primary investor of Blue Barn, is entitle one hundred percent of the reasonable value of services invested in Plaintiffs' failing business.

In implementing these approaches, Dr. Fishkind fails to take into account that Blue Barn and Datex comprise "the Buyers" (collectively) of Plaintiffs. The Buyers seek determination of their damages sustained as a direct result of their joint efforts invested in turning Plaintiffs' failing businesses around. Under the quantum meruit theory, "a plaintiff [the Buyers] must allege facts that, taken as true, show that the plaintiff [the Buyers] provided, and the defendant [the Plaintiffs] assented to and received, a benefit in the form of goods or services." *See* W.*R. Townsend Contracting, Inc. v. Jensen Civil Const., Inc.*, 728 So. 2d 297, 305 (Fla. 1st DCA 1999). Thus, Dr. Fishkind's report endeavors to isolate the activities of Datex and Blue Barn, activities which Dr. Fishkind readily admits there is "no distinction" between. Ex. A, p. 32: 11-14. This critical error in methodology alone is sufficient to exclude Dr. Fishkind's testimony.

In additional, as a result of Dr. Fishkind's invalid assumptions noted above, his report employs a deceptive calculation in order to quantify the value of the *services rendered by the Buyers*. Ex. C, ¶¶ 54.0- 55.0. "The evaluation of a quantum meruit claim is based on the "reasonable value of the labor performed, and the market value of any materials furnished." *Moore v. Spanish River Land Co*., 1935, 118 Fla. 549, 159 So. 673; *see also Sea Byte, Inc. v. Hudson Marine Mgmt. Services, Inc.,* 565 F.3d 1293, 1303 (11th Cir. 2009). Thus, Dr. Fishkind's report, in relying on the *Mr. Barkai-Barnik's* expenditure of 3,000 hours on turning Plaintiffs' business around, is categorically misleading will confuse the trier of fact. Ex. C, ¶ 55.0. A rigid breakdown of Mr. Barkai-Barnik's hours is irrelevant to a quantum meruit cause of action alleged by *Blue Barn* and is irrelevant to determining the reasonable value of the benefit invested in Plaintiffs.

Dr. Fishkind focuses on *employee compensation*, and not determining the reasonable value of *the Buyers' services invested in Plaintiffs*. As such, Dr. Fishkind's compensation approach will be of no assistance to the trier of fact because it fails to relate to the issues relevant to this case.

## CONCLUSION

Dr. Fishkind's report implements two alternates, and equally unreliable, approaches in purporting to determine the reasonable value of Blue Barn's efforts invested in turning Plaintiffs' businesses around. Dr. Fishkind relies on invalid assumptions and conclusory methodology that, assert that Blue Barn cannot establish that its efforts assisted Plaintiffs' turnaround. *See Cook ex rel. Estate of Tessier*, 402 F.3d at 1113. Yet, even Plaintiffs agree that Blue Barn's efforts provided a benefit to them. Ex. A, 31: 20-25.  Dr. Fishkind simply applies his methodologies to the Parties transaction without considering their relevance to the facts of this case. *Id*., at 17: 16-22. Assistance to the trier of fact is "key" to an expert's testimony and when that testimony relies upon irrelevant facts, that testimony must be precluded. *See Quiet Tech. DC-8, Inc.* 326 F.3d at 1347.

Triers of fact afford experts great latitude, as well they should, in matters which are beyond general understanding. As such, the courts must take care to ensure that an expert's testimony must be based on reliable methodology and related to relevant facts of the case. In essence, the entirety of Dr. Fishkind's report attempts to connect his opinion evidence to existing data by his own "ipse dixit", and "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Blue Barn respectfully requests that the Court exclude Dr. Fishkind's testimony from being heard at trial.

Respectfully submitted,

*/s/ William Litvak*
William Litvak
Cal. Bar. No. 90533, admitted *pro hac vice*
Eric P. Markus
Cal. Bar No. 281971, admitted *pro hac vice*
**DAPEER, ROSENBLIT & LITVAK, LLP**
11500 West Olympic Blvd., Suite 550
Los Angeles, CA 90064

Telephone: (310) 477-5575
Facsimile: (310) 477-7090
Email – wlitvak@drllaw.com
   emarkus@drllaw.com
*Counsel for Blue Barn Holdings, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 3.01(g) of the Local Rules of the United States District Court for the Middle District of Florida, the undersigned counsel certifies that they have conferred with counsel for the other parties regarding the issues raised in this motion. Counsel were unable to agree on the resolution of the motion.

     */s/ William Litvak*

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically.

*Attorneys for Plaintiffs*

**Paul McDermott**
paul.mcdermott@hklaw.com
**Daniel Buchholz**
daniel.buchholz@hklaw.com
HOLLAND & KNIGHT, LLP
100 N. Tampa Street, Suite 4100
Tampa FL 33602
T: (813) 227-8500

*Attorneys for Defendant Datex Instruments Inc.*

**Jaime Austrich**
jaustrich@shumaker.com
**Brian W. Schaffnit**
bschaffnit@slk-law.com
SHUMAKER, LOOP & KENDRICK, LLP
101 E. Kennedy Blvd., Suite 2800
Tampa, FL 33602
T: (813) 229-7600

/s/ William Litvak
William Litvak