UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


SENSOR SYSTEMS LLC, ET AL.,

       Plaintiffs,

v.                            Case No.  8:19-cv-2581-SCB-AAS

BLUE BARN HOLDINGS, INC. and
DATEX INSTRUMENTS INC.,

       Defendants.

_____/

## ORDER

This cause comes before the Court on three <u>Daubert</u> motions (Doc. No. 90,

91, 96) and the responses thereto (Doc. No. 103, 106, 107).

## I.  Background

This lawsuit arose after a transaction for the sale of Plaintiffs' assets and

related real estate (owned by RAMA) to Defendants Blue Barn and Datex for $3.5

million failed to close under the parties' Letter of Intent ("LOI").  The parties' LOI

was amended once, extending the closing date for the transaction to May 31, 2018.

The LOI provided that Defendants would begin operating and managing

Plaintiffs' businesses in December of 2017 until the transaction closed.  Despite

the transaction failing to close by May 31, 2018, Defendants continued to manage

and operate Plaintiffs' businesses under the belief that the transaction would still

close.  By October of 2019, the transaction did not close, and Plaintiffs filed suit seeking a declaratory judgment that the parties' LOI was not enforceable.

After cross-motions for summary judgement, only Blue Barn's and Datex's counterclaims against Plaintiffs for unjust enrichment (both defendants) and quantum meruit (Blue Barn) remain for trial.  Defendants contend that Plaintiffs have been unjustly enriched by Defendants' operation and management of Plaintiffs' businesses and that Defendants should be compensated at fair value for their services.  The parties have retained five experts to opine on the issue of Defendants' damages, and three <u>Daubert</u> motions have been filed that are directed at three of the experts.

## II.  Standard of Review

This Court performs "a gatekeeping role" regarding admissibility of expert testimony.  <u>See</u> <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 597 (1993).  Federal Rule of Evidence 702 provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FRE 702. The proponent of the expert testimony has the burden of showing, by a preponderance of the evidence, that the testimony satisfies each of the following prongs:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Hendrix ex rel. G.P. v. Evenflo Co., 609 F.3d 1183, 1994 (11th Cir. 2010).

## III.  Daubert Motions

Plaintiffs have filed two Daubert motions related to Blue Barn's experts—one directed at Stephen Kirkland and one directed at Peter Gampel. Blue Barn has filed a Daubert motion directed at one of Plaintiffs' experts, Henry Fishkind. Accordingly, the Court will analyze each Daubert motion.

### A.  Gampel

Blue Barn retained Gampel as an expert to opine as to the value of Plaintiffs' assets and related real estate owned by RAMA. Gampel identifies three approaches for valuing the assets and real estate: (1) the asset approach (he contends that this approach leads to the minimum/floor value), (2) the income approach (in which "value is determined by converting future economic benefits

into their present value, as of the appraisal date"[1]), and (3) the market approach (he contends that this approach is not appropriate in this case). He then provides two valuations, one under the asset approach and one under the income approach.

Gampel opines that the asset approach values Plaintiffs' assets as of October 31, 2019 as being approximately $6.5 million, not including the real estate owned by RAMA.[2] Gampel opines that the income approach values Plaintiffs' assets (including the RAMA real estate, which was valued at $2.6 million in an April 24, 2017 appraisal) as of October 31, 2019 as being $17,855,000.[3]

Plaintiffs filed a Daubert motion seeking to exclude Gampel's opinions on two grounds: (1) Gampel's valuation of the assets is unreliable; and (2) Gampel should be prohibited from testifying as to the specific conduct that Defendants undertook to operate and manage Plaintiffs' businesses. As explained below, the Court rejects Plaintiffs' argument that Gampel's valuation opinions should be excluded as unreliable, but the Court agrees that Gampel should be prohibited from testifying as to the specific conduct that Defendants undertook to operate and manage Plaintiffs' businesses.

---

[1] (Doc. No. 91-1, p. 25 of 91)
[2] (Doc. No. 91-1, p. 22-23, 36 of 91)
[3] (Doc. No. 91-1, p. 31 of 91)

4

## 1.  Gampel's Valuation of the Assets

Gampel valued the assets at issue as being worth $17,855,000 as of October 31, 2019.  Plaintiffs contend that this valuation should be excluded as unreliable for five reasons.  First, Plaintiffs argue that Gampel assumes that the entire increase in value in the assets is due to Defendants' efforts, and this is improper speculation.  However, there is evidence that Defendants operated and managed Plaintiffs' businesses and that the people who previously operated and managed Plaintiffs' businesses no longer did so after Defendants took over.  As such, this is not a basis for excluding Gampel's valuation opinions.

Second, Plaintiffs argue that the proposed asset sale was speculative, was based on contingencies and uncertainties, and Gampel's valuation is based on potential future best case scenarios.  Again, the Court rejects this argument as a basis for exclusion.  In this case, Defendants' efforts have already occurred, and Gampel's valuation is based on Plaintiffs' 2018 and 2019 financial positions.

Third, Plaintiffs argue that Gampel uses the wrong valuation date by using October 31, 2019—a date that Plaintiffs contend is of no consequence in this case. The Court rejects this argument as a basis for exclusion.  Plaintiffs filed this lawsuit in October of 2019, and as such, there is a basis for valuing the assets as of October 31, 2019.

Fourth, Plaintiffs argue that the $3.5 million purchase price in the LOI cannot be used as the initial value of the assets when determining their increase in value, because the $3.5 million purchase price is not necessarily the fair market value of the assets as of the date that Defendants took over operating and managing Plaintiffs' businesses. Plaintiffs argue that fair market value is the price at which the assets would have changed hands between a willing buyer and willing seller, neither being under a compulsion to buy or sell and both having knowledge of the relevant facts. Whether the $3.5 million purchase price was the fair market value of the assets in December of 2017 is a question of fact for the jury to decide, and it is not a basis to exclude Gampel's opinions. Plaintiffs can question Gampel about his reliance on the $3.5 million purchase price and the effect it would have on his opinion if the jury finds that the assets were initially worth more than $3.5 million.

Fifth, Plaintiffs argue that Gampel did not consider all relevant documents and facts. For example, Plaintiffs argue that Gampel failed to consider Plaintiffs' financial performance prior to 2018 and only considered the financial performance of Plaintiffs once their businesses improved. Given that Gampel was opining as to the increase in the value of the assets due to Defendants' operation and management in 2018 and 2019, it appears that there is a basis for considering Plaintiffs' financial positions in only those past years. Again, Plaintiffs can question Gampel as to how his failure to consider Plaintiffs' financial positions in

prior years affects his calculations, but this is not a basis for excluding his opinions.

Plaintiffs also argue that Gampel did not rely on the correct financial documents and journal entries. Again, Plaintiffs and Gampel simply disagree as to the relevant underlying facts and documents to be used to value the assets, but this is not a basis for excluding his opinions.

Based on the above, Plaintiffs have identified many variables that factor into Gampel's opinions with which they disagree. However, their disagreement is not a basis for finding Gampel's opinions to be unreliable. Instead, their arguments go to the weight, rather than the admissibility, of Gampel's opinions, and Plaintiffs can challenge his opinions through vigorous cross-examination. See Quiet Technology DC-8, Inc. v. Hurel-Dubois UK, Ltd., 326 F.3d 1333, 1343-46 (11th Cir. 2003) (pointing out the distinction between the reliability of an expert's methodology and the reliability of the expert's conclusion based on reliable methodology but flawed inputted data; finding that when the methodology is reliable, cross-examination can be used to point out the flawed data used to challenge the ultimate opinion; the challenge goes to the weight of the evidence and not its admissibility); Advanced Bodycare Solutions, LLC v. Thione International, Inc., 615 F.3d 1352, 1363-64 (11th Cir. 2010) (finding that the objections to the expert's opinion based on the accuracy of the underlying data

went to the weight, rather than admissibility, of the evidence). As such, the Court denies Plaintiffs' motion as to these issues.

## 2. Gampel Testifying about Defendants' Conduct

Part of Gampel's expert report consists of a summary of the efforts that Blue Barn undertook in order to operate and manage Plaintiffs' businesses. Plaintiffs argue that Gampel should be prohibited from testifying as to the specific conduct that Defendants undertook, because such testimony is irrelevant to the issue that he is opining on—the increase in the value of the assets. Further, Plaintiffs argue that Gampel does not have firsthand knowledge of the information, nor did he investigate or verify the information, and instead, he is simply relaying information that Blue Barn told him.

The Court agrees with Plaintiffs that Gampel should be precluded from describing Defendants' specific operation and management efforts. The lay witnesses in this case can testify as to Defendants' efforts. An expert is not needed to summarize Defendants' efforts, and allowing Gampel to do so could improperly cloak such testimony as expert testimony when expert testimony on the subject is not warranted. Accordingly, to the extent that Plaintiffs seek to prohibit Gampel from testifying as to the specific conduct that Defendants undertook in order to operate and manage Plaintiffs' businesses, the Court grants Plaintiffs' motion.

## B. Kirkland

Blue Barn retained Kirkland as an expert to opine on the reasonable compensation that Plaintiffs should be required to pay for the services provided by Blue Barn. Kirkland states that Plaintiffs' businesses made a dramatic turnaround after Mr. Barnik took over management due to his expertise and active involvement. Therefore, Kirkland states that Mr. Barnik's "compensation should be tied to the results he achieved, otherwise known as his output, rather than to his input."[4]

As a result, Kirkland applied the independent investor approach to valuing Mr. Barnik's efforts, which he calculated as follows:[5] First, Kirkland stated that a reasonable return for the owner of Plaintiffs would be 10% to 15% annually. Second, he stated that a 15% return for the period between December 21, 2017 and September 30, 2019 would have increased owners' equity by approximately $1 million.[6] Third, he takes Gampel's valuation of the assets ($17,855,000) and subtracts the $3.5 million purchase price that was set forth in the LOI, and then he subtracts the $1 million of equity appreciation, to conclude that Defendants' efforts increased the value of the assets by $13,355,000. Fourth, he splits that

---

[4] (Doc. No. 90-1, p. 12 of 24)
[5] (Doc. No. 90-1, p. 14 of 24)
[6] It appears that he took the $3.5 million purchase price that was set forth in the LOI and multiplied it by 15% and then multiplied that amount by 1.75 years.

$13,355,000 in half ($6,677,500) to allocate half of the value to Blue Barn/Mr. Barnik's efforts (the other half would be due to Datex's efforts).

Plaintiffs filed a <u>Daubert</u> motion to exclude Kirkland's opinions on three grounds. Specifically, Plaintiffs argue: (1) his opinions are not reliable, because he does not employ any methodology and he failed to consider relevant facts from the record; (2) his opinions are not helpful or relevant, because he fails to separate the efforts of Blue Barn and Datex and he assumed the wrong measure of damages; and (3) he is not qualified to opine on the value of Plaintiffs' assets, since he does not do business valuations. As explained below, the Court rejects Plaintiffs' arguments.

## 1. Reliability

Plaintiffs argue that Kirkland's opinions should be excluded, because they are not reliable for two reasons. First, Plaintiffs argue that Kirkland's opinions are not reliable, because he does not employ any methodology; he simply blindly relies on Gampel's valuation to come up with his own valuation of Blue Barn's damages. Thus, Plaintiffs argue that it was improper for Kirkland to rely on Gampel's valuation without verifying its accuracy.

"An expert may properly rely on the opinion of another expert. The judicial inquiry is whether the first expert's opinion is 'of a type reasonably relied upon by experts in the particular field.' Experts may not, however, simply repeat or adopt

the findings of other experts without investigating them." <u>Hendrix v. Evenflo Co., Inc.</u>, 255 F.R.D. 568, 607 n.75 (N.D. Fla. 2009)(internal citations omitted). The Court finds that Kirkland's reliance on Gampel's valuation was not improper.

The Court has already found that Gampel's valuation opinions are admissible. A review of Kirkland's deposition testimony shows that he did not blindly rely on Gampel's opinions. (Doc. No. 90-2, depo. p. 90-99). Instead, he read through a draft of Gampel's expert report and did not notice any errors in it.[7] (Doc. No. 90-2, depo. p. 90-91). Kirkland took into consideration all of the information that was provided to him, and Kirkland prepared his own financial statements for Plaintiffs, in order to determine that Gampel's valuation appeared reasonable. (Doc. No. 90-2, depo. p. 91-94). Kirkland has read many business valuation reports before, so his review of Gampel's valuation was not something new to him. (Doc. No. 90-2, depo. p. 94). He also spoke with Gampel on the phone for approximately a half hour. (Doc. No. 90-2, depo. p. 94-95). Thus, Kirkland's use of Gampel's valuation as a component in his damages calculation was not improper and is not a basis for exclusion. <u>See</u> <u>In re 3M Combat Arms</u>

---

[7] Kirkland has a Bachelor of Business Administration with an Accounting concentration and a Master of Tax Accounting. (Doc. No. 107-2, p. 18 of 24). He spent ten years with PricewaterhouseCoopers and twenty-two years as a partner in local accounting and consulting firms. (Doc. No. 107-2, p. 18 of 24). He founded his consulting company, where he is a compensation, tax and financial consultant serving closely held businesses and non-profit organizations across the country. (Doc. No. 107-2, p. 18 of 24). He works a lot with business valuators and many years ago had prepared business valuations. (Doc. No. 90-2, depo. p. 268).

Earplug Products Liability Litigation, 2021 WL 765019, at *30 (N.D. Fla. Feb. 28, 2021) (denying motion to exclude an expert's testimony on economic loss due to that expert relying, in part, on another expert's opinions on the plaintiffs' loss of earning capacity and work-life expectancy; court found that the expert at issue had relied on multiple sources and that experts are permitted to rely on other experts); Palma v. Safeco Ins. Co. of Illinois, 2021 WL 1405507, at *3 (M.D. Fla. Apr. 14, 2021) (denying motion to exclude the defense expert's testimony on lost earnings when the expert at issue relied on the plaintiffs' expert's report on lost earnings, the plaintiffs' vocational expert's reports, and the plaintiffs' deposition transcripts; court found that an expert may partially rely on another expert's report to form their own opinion).

To the extent that Plaintiffs take issue with the simplicity of Kirkland's calculation—he takes Gampel's valuation of $17,855,000, subtracts the $3.5 million purchase price, subtracts $1 million for equity appreciation, and then halves the amount—the Court rejects their argument. The individual investor approach consists of those steps and can be a valid method for valuing compensation. See Exacto Spring Corp. v. C.I.R., 196 F.3d 833, 838-39 (7th Cir.

1999).[8]  The simplicity of a methodology does not affect its reliability if the methodology itself is reliable.

Plaintiffs' second ground for arguing that Kirkland's opinions are not reliable is that they contend that he  failed to consider relevant facts from the record.  Specifically, they contend that Kirkland does not know of the specific efforts that Blue Barn undertook in order to manage and operate Plaintiffs' businesses, nor does he know anything about Blue Barn's representatives' experience or amount of time that they expended.  The flaw in this argument is that those facts are not part of the independent investor valuation approach, which looks at the increase in value of Plaintiffs' assets and the rate of return that an independent investor would expect to receive.  As such, this is not a basis for excluding Kirkland's opinions.

## 2.  Helpfulness and Relevancy

Next, Plaintiffs argue that Kirkland's opinions should be excluded, because his opinions are not helpful or relevant for two reasons.  First, Plaintiffs argue that Kirkland's opinions are not helpful or relevant, because he fails to separate the efforts of Blue Barn and Datex and he fails to consider the efforts of others.

---

[8] The Exacto Spring court has explained the independent investor approach as follows: "A corporation can be conceptualized as a contract in which the owner of assets hires a person to manage them. The owner pays the manager a salary and in exchange the manager works to increase the value of the assets that have been entrusted to his management; that increase can be expressed as a rate of return to the owner's investment. The higher the rate of return (adjusted for risk) that a manager can generate, the greater the salary he can command."  196 F.3d at 838.

Instead, Kirkland assumed all of the asset appreciation came from Datex and Blue Barn's efforts collectively, and after coming up with a valuation, he divided the amount in half to represent the value of Blue Barn's damages. The Court rejects this argument and finds that this challenge goes to the weight, rather than the admissibility of Kirkland's testimony, and Plaintiffs can raise this issue through cross-examination.

Second, Plaintiffs argue that Kirkland's opinions are not helpful or relevant because he assumed the wrong measure of damages when he valued Defendants' output (*i.e.*, the increase in value of the assets) rather than valuing Defendants' input (*i.e.*, the specific services they rendered). The Court rejects this argument, because "'[d]images for unjust enrichment may be valued based on either (1) the market value of the services; or (2) the value of the services to the party unjustly enriched.'" See Merle Wood & Assocs., Inc. v. Frazer, 307 So. 3d 773, 776 (Fla. 4th DCA 2020) (quoting Alvarez v. All Star Boxing, Inc., 258 So. 3d 508, 512 (Fla. 3d DCA 2018)); see also Arey v. Williams, 81 So. 2d 525, 526 (Fla. 1955) (finding that the defendant, who had renovated the plaintiff's property while the defendant was living there, was entitled to damages measured by the amount to which the improvements increased the value of the property); Levine v. Fieni McFarlane, Inc., 690 So. 2d 712, 713 (Fla. 4th DCA 1997) (finding that the plaintiff, who wanted to lease part of the defendant's building and spent substantial

sums renovating it, was entitled to damages for unjust enrichment "based on enhancements to the property from the standpoint of the owner"); Kane v. Stewart Tilghman Fox & Bianchi, P.A., 85 So. 3d 1112, 1114-15 (Fla. 4th DCA 2012) (finding that the appropriate measure of damages for one law firm's effort in helping the other law firm obtain a large settlement was 50% of the benefit obtained (*i.e.,* the attorneys' fee award)). As such, this is not a basis for excluding Kirkland's testimony.

### 3. Qualification

Next, Plaintiffs argue that Kirkland's opinions should be excluded, because he is not qualified to opine on the value of Plaintiffs' assets. Specifically, they argue that his qualifications do not include doing business valuations. Blue Barn responds that Kirkland is not providing a business valuation opinion; he is opining on the value of Blue Barn's services. As this Court has already found, it was permissible for Kirkland to rely on Gampel's business valuation in order to calculate the value of Blue Barn's services. Thus, this is not a basis for excluding Kirkland, and Plaintiffs' Daubert motion as to Kirkland is denied.

### C. Fishkind

Plaintiffs retained Fishkind as an expert to rebut Dinkin's damages valuations for Datex and Kirkland's damages valuations for Blue Barn. Only Fishkind's opinions relating to Blue Barn's damages are at issue. Kirkland valued

Blue Barn's damages as being $6.7 million, and Fishkind contends that the proper method for calculating Blue Barn's damages would be to apply a 3.25% termination fee to the transaction.

Under a termination fee approach, Fishkind calculates Blue Barn's damages to be $81,250 as follows: Fishkind multiplies the $5 million LOI purchase price[9] by 3.25%, which totals $162,500. Fishkind then divides the $162,500 in half to represent Blue Barn's damages for Blue Barn's half of the management of Plaintiffs' businesses.

Fishkind then critiques Kirkland's calculation, opining that the independent investor approach is inapplicable, because it "is typically used in the context of determining the reasonable compensation paid by closely held companies to their owner-employees."[10] Fishkind also points out that Kirkland does not identify a specific basis for his use of a 15% return on investment that he used in his calculation.

Fishkind also opines that another way to value Blue Barn's damages is to value Mr. Barnik's efforts based on the compensation normally paid to private equity professionals, which Fishkind opines would be $362,500 per year in this case. Fishkind then rejects Mr. Barnik's estimate that he expended at least 3,000

---

[9] The $5 million purchase price is based on the $3.5 million base purchase price, plus the $1.5 million Potential Earnout Payment.
[10] (Doc. No. 96-4, p. 10 of 36)

hours managing Plaintiffs' businesses, and Fishkind reduces the number to the 373 hours that he believes can be verified. Fishkind then concludes that 373 hours equates to 19% of a year of work, and he multiples $362,500 by 19% to get damages of $67,6677.

Blue Barn filed a <u>Daubert</u> motion to exclude Fishkind's opinions on three grounds. Specifically, Blue Barn argues that: (1) Fishkind is not qualified to value Blue Barn's efforts in turning around Plaintiffs' businesses; (2) Fishkind's opinions regarding a termination fee are irrelevant and will mislead the jury, because a termination fee is not an appropriate measure of Blue Barn's damages; and (3) Fishkind's compensation approach to valuation is based on unreliable methodology. As explained below, Blue Barn's motion is granted in part and denied in part.

### 1. Qualification

Blue Barns argues that the Court should exclude Fishkind's opinions, because he is not qualified to value Blue Barn's efforts in turning around Plaintiffs' businesses. Fishkind has both a Bachelor's degree and Ph.D. in economics. (Doc. No. 96-4, p. 22 of 36). He has over 30 years of experience in economic analysis and forecasting, and he formed his own economic and consulting firm almost 25 years ago. (Doc. No. 96-4, p. 22 of 36). Fishkind is "regularly engaged to assist [his] clients in evaluating various kinds of business transactions, to estimate

damages that arise from various types of disputes, and that often involves estimating executive compensation levels." (Doc. No. 96-2, depo. p. 116; Doc. No. 96-4, ¶ 11). He has been an expert witness that provided economic testimony on more than fifty occasions, and he has served as a court-appointed expert that provided valuation reports to the U.S. Tax Court. (Doc. No. 96-4, ¶ 12).

Upon review, the Court finds that based on his education and experience, Fishkind is qualified to offer his opinions on the value of Blue Barn's efforts in turning around Plaintiffs' businesses. "The qualification standard for expert testimony is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co., 674 F. Supp.2d 1321, 1325 (S.D. Fla. 2009) (internal quotation marks and citations omitted). Thus, Fishkind's qualifications are not a basis for excluding him, and Blue Barn can point out any perceived deficiencies in his qualifications through cross examination.

## 2.  Termination Fee

Next, Blue Barn argues that Fishkind's opinions regarding a termination fee are irrelevant and will mislead the jury, because a termination fee is not an appropriate measure of Blue Barn's damages.  The Court agrees.

Fishkind explains a termination fee as follows: "Given the time and expense involved in pursuing, structuring, and negotiating transactions, . . . termination fees are often included in purchase offers and LOIs by potential buyers." (Doc. No. 964-, ¶ 52). Thus, a termination fee is an amount paid for the time and expense of pursuing a deal that is not consummated.

However, in this case, there was no termination fee in the LOI and Blue Barn is seeking compensation for the operating and management services that it provided to Plaintiffs. Even Fishkind acknowledged that "it's highly unusual . . . for a party to an LOI to start rendering the kind of management services that Blue Barn and Datex provided to [Plaintiffs]." (Doc. No. 96-2, depo. p. 66). As such, the Court agrees with Blue Barn that Fishkind has not shown that a termination fee is relevant to the issue of valuing Blue Barn's services.[11] Thus, the Court finds Fishkind's opinions regarding a termination fee are irrelevant and would likely confuse the jury, and therefore, those opinions are excluded.

### 3. Compensation Approach

Next, Blue Barn argues that Fishkind's opinions regarding the compensation approach to valuation are based on unreliable methodology. The Court agrees.

---

[11] The value of the services that Blue Barn provided to Plaintiffs by operating and managing their businesses (which is an issue in this case) is an entirely different issue from the value of Defendants' time and expense in pursuing the asset sale that failed to close (which is not an issue in this case, but for which a termination fee could be appropriate if it were an issue in this case).

In his expert report, Fishkind states that another way to value Blue Barn's damages is to value Mr. Barnik's efforts based on the number of hours he expended and the compensation normally paid to private equity professionals, which Fishkind opines would be $362,500 per year in this case. (Doc. No. 96-4, ¶ 54). However, in support of this opinion, Fishkind cites to data from a 2016 compensation survey that was based on just two responses regarding partner/managing directors' compensation. (Doc. No. 96-4, ¶ 54 and n.29; Doc. No. 96-6, p. 11 of 39). Blue Barn argues that this is not a proper comparison in that private equity managers manage investments of other investors, which is very different from what Blue Barn was doing for Plaintiffs—providing services to Plaintiffs' failing businesses with the belief it would recoup its investment when it owned the companies. Furthermore, as Blue Barn points out, Mr. Barnik is the managing partner of Blue Barn (which is a different category in the compensation survey, to which there were no survey responses), not a partner/managing director. Thus, the Court agrees that Fishkind's opinions regarding the compensation approach to valuation is based on unreliable methodology, is irrelevant, and should be excluded.

### 4. Permitted Testimony

The Court has found that Fishkind is not permitted to opine about the value of Blue Barn's damages based on a termination fee approach or based on a

compensation approach.  However, Fishkind is qualified to rebut Kirkland's expert opinions by pointing out the alleged flaws in his opinions.  Further, Fishkind is permitted to provide expert testimony regarding Datex's damages.

## IV.  Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1)	Plaintiffs' Motion to Exclude Gampel's Opinions (Doc. No. 91) is **GRANTED TO THE EXTENT** that Plaintiffs seek to prohibit Gampel from testifying as to the specific conduct that Defendants undertook in order to operate and manage Plaintiffs' businesses; otherwise, the motion is **DENIED**.

(2)	Plaintiffs' Motion to Exclude Kirkland's Opinions (Doc. No. 90 is **DENIED**.

(3)	Blue Barn's Motion to Exclude Fishkind's Opinions (Doc. No. 96) is **GRANTED TO THE EXTENT** that Fishkind is not permitted to opine about the value of Blue Barn's damages based on a termination fee approach or based on a compensation approach; otherwise, the motion is **DENIED**.

DONE AND ORDERED at Tampa, Florida, this 29th day of April, 2021.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record